**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER EILEEN GILLIAM, | ) | CASE NO. 1:25-CV-1287 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jennifer Eileen Gilliam's application

for Disability Insurance Benefits (DIB). Ms. Gilliam seeks judicial review of that decision pursuant

to 42 U.S.C. §§ 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule

72.2(b). (*See* ECF non-document entry dated June 20, 2025.)

For the reasons set forth below, I RECOMMEND that the Court REVERSE the

Commissioner's decision and REMAND this matter for further proceedings consistent with this

Report and Recommendation.

## II.    PROCEDURAL HISTORY

In June 2022, Ms. Gilliam applied to the Social Security Administration (SSA) seeking

DIB; she claimed that she became disabled on January 1, 2015. (Tr. 157.)[1] She identified eleven

allegedly disabling conditions: (1) Addison's disease; (2) secondary adrenal insufficiency;

(3) chronic pancreatitis; (4) avascular necrosis of the bones; (5) pelvic floor dysfunction;

---

[1] The administrative transcript appears at ECF No. 7. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 29"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 6898").

(6) generalized muscle weakness; (7) sinus tachycardia; (8) urinary incontinence; (9) labile blood pressure; (10) chronic complex migraines; and (11) Raynaud syndrome. (Tr. 196.)

The SSA denied Ms. Gilliam's application initially and upon reconsideration. (Tr. 74, 82, 83.) Ms. Gilliam requested a hearing before an administrative law judge (ALJ). (Tr. 237.) The ALJ held a hearing on July 6, 2023, at which Ms. Gilliam waived her right to representation and proceeded pro se. (Tr. 43.) Ms. Gilliam testified, as did an independent vocational expert (VE). (Tr. 37–73.)

On December 28, 2023, the ALJ issued a written decision finding that Ms. Gilliam is not disabled. (Tr. 17–29.) Ms. Gilliam requested review of the ALJ's decision, and her counsel submitted a letter–brief regarding alleged errors in the ALJ's decision. (Tr. 258–59.) After granting several extensions, the Appeals Council denied review on May 9, 2025, rendering the ALJ's decision final. (Tr. 1.)

On June 20, 2025, Ms. Gilliam filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Gilliam asserts the following assignment of error for review:

> The ALJ failed to properly evaluate the severity of Plaintiff's impairments prior to her date last insured. Plaintiff's impairments and functional restrictions establish disability as of her DLI. A remand for calculation of benefits is therefore warranted.

(Pl.'s Merit Br. at 9, ECF No. 9, PageID# 6898.)

## III.  BACKGROUND

### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Gilliam was born in October 1983 and was 39 years old on the date of her application. (Tr. 48, 157.) Ms. Gilliam has a master's degree in business and worked for seven years as an import–export specialist for a government defense contractor. (*See* Tr. 49–51.) She last worked in

2015. (Tr. 50.) Ms. Gilliam lives with her husband. (Tr. 50.) She is currently receiving supplemental security income (SSI). (Tr. 51–52.)

### B. Relevant Hearing Testimony

#### 1. Ms. Gilliam's Testimony

Ms. Gilliam testified that she suffered a series of concussions and head injuries, after which she developed post-concussion syndrome. (Tr. 52.) She suffered chronic complex migraines and found herself in "constant pain." (*Id.*) On one occasion, her legs "just gave out" when she was walking to her car. (Tr. 52–53.)  She began having more difficulty moving and exercising "physical[] control of [her] muscles." (Tr. 53.) She became weaker. (*Id.*) She began having difficulty thinking clearly. (*Id.*) She was eating a lot, but she could not gain weight. (*Id.*) She was constantly tired. (*Id.*)

She took short-term disability from her work, and she tried to go back to work when she ran out of time off. (Tr. 55.) But she had too much difficulty working. (*Id.*)

Ms. Gilliam said that at some point prior to 2020, medical professionals gave her a cane and a walker. (Tr. 56.) But she did not use them because she wanted to walk on her own. (*Id.*) Ultimately, beginning in 2020, she began using a wheelchair. (Tr. 55–56.)

Ms. Gilliam said that before 2019, she could not stand for six hours at a time because her legs "would not hold [her] for that long." (Tr. 56.) Her body would be in "excruciating" pain to stand for that long. (Tr. 57.) She also had pain sitting for long periods of time, and the pain continued getting worse. (*Id.*)

Ms. Gilliam's migraines were so bad that she would sometimes spend weeks in bed. (*Id.*) She was having migraines every day. (*Id.*) Even at the time of the hearing, she was having daily migraines despite trying several different medications and treatments over the years. (Tr. 57–58.)

Ms. Gilliam was under the care of two endocrinologists for Addison's disease. (Tr. 60.) She took steroids for the condition, but her understanding was that the steroids made her other physical problems worse. (Tr. 62–63.)

Ms. Gilliam said that she had avascular necrosis in her knees, hips, and shoulders. (Tr. 69.) She has pelvic floor dysfunction, as well as "an array of GI and urinary issues." (*Id.*)

### 2. *Vocational Experts' Testimony*

Sarah Holmes testified as a vocational expert ("VE") at the hearing. (Tr. 63.) She classified Ms. Gilliam's past relevant work as that of an import–export agent (DOT 184.117-022). (Tr. 65.)

The ALJ asked the VE to assume that a hypothetical person with past relevant work as an import–export agent was limited to work at the light exertional level with several additional limitations. (*Id.*) Specifically, the person could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (*Id.*) The person could never climb ladders, ropes, or scaffolds, and they must avoid all exposure to hazards like unprotected heights and moving machinery. (Tr. 65–66.) They cannot drive commercially. (Tr. 66.) They can understand, remember, and carry out simple instructions in a routine work setting. (*Id.*) They can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but they cannot perform at a production-rate pace. (*Id.*) Their work must require no more than superficial interaction, which the ALJ defined as interaction that does not involve negotiating with, instructing, persuading, or directing the work of others. (*Id.*)

The VE testified that such a person could not perform the work of an import–export agent but could perform the work of an information clerk (DOT 237.367-018), cashier (DOT 211.462-010), or merchandise marker (DOT 209.587-034).

The ALJ next asked the VE to assume that the hypothetical person was further limited, in that they could only perform work at the sedentary exertional level. (Tr. 67.) The VE testified that such a person could perform the work of a document preparer (DOT 249.587-018), sorter (521.687-086), or order clerk (DOT 209.567-014). (*Id.*)

The VE testified that it is work-preclusive for a person to be off-task for 20 percent of the workday or to be absent two times per month on an ongoing basis. (Tr. 67–68.)

### C.    State Agency Consultants

A disability examiner (Margaret Johnson), a physician (Mehr Siddiqui, M.D.), and a psychologist (David Dietz, Ph.D.) reviewed Ms. Gilliam's claim at the initial review level. (Tr. 74–82.)

Dr. Siddiqui found that there was no evidence on file to evaluate Ms. Gilliam's conditions between the alleged onset of disability and her date last insured. (Tr. 79.)

Dr. Dietz similarly found that the records showed a history of narcotic addiction and Cluster B personality disorders, as well as depression, but he concluded that there was insufficient evidence to determine the severity of those conditions or opine on functional limitations. (*See* Tr. 80.)

The consultants noted that the medical evidence corroborated that Ms. Gilliam is "frail" and "non-ambulatory." (Tr. 81.)

Based on these opinions, the agency consultants determined that Ms. Gilliam is not disabled. (Tr. 82.)

In a letter to Ms. Gilliam explaining this decision, the Agency wrote that it did not have any records of treatment within the relevant time period. (Tr. 94.)

A disability examiner (Lauren Kulesza), physician (Abraham Mikalov, M.D.), and psychologist (Karla Delcour, Ph.D.) reviewed Ms. Gilliam's claim at the reconsideration level. (Tr. 83–89.)

Dr. Mikalov affirmed the initial-level findings, opining that the additional historical evidence was insufficient to revise the decision. (Tr. 86.)

Dr. Delcour also affirmed the initial-level findings, as written. (Tr. 87.)

But the reconsideration-level consultants found that Ms. Gilliam's statements about the intensity, persistence, and functionally limiting effects of her conditions were not consistent with the medical evidence, noting that those statements were unsupported by evidence prior to the DLI. (Tr. 87–88.)

In a letter to Ms. Gilliam explaining this decision, the Agency wrote that there was no evidence to determine the presence and severity of any potentially disabling conditions at the time during which she was last eligible for disability benefits. (Tr. 101.)

### D. Relevant Medical Evidence

The record in this case is extensive—nearly 6,900 pages long—but many of the records significantly postdate Ms. Gilliam's date last insured. I will therefore focus this discussion on the records cited by the parties as relevant to their positions on Ms. Gilliam's sole assignment of error.

In July 2014, Marc Sharfman, M.D., submitted a letter in support of a disability application for Ms. Gilliam. (Tr. 260.) Dr. Sharfman identified that Ms. Gilliam had been diagnosed with refractory migraine, intractable fatigue, hypotension with tachycardia, hypothyroidism, and "probable narcolepsy." (*Id.*) He wrote that her narcolepsy causes "intractable fatigue" and her migraine headaches cause "cognitive dysfunction." (*Id.*)

In November 2015, ten months after the alleged disability-onset date, Ms. Gilliam presented to Johnson City Medical Center in Tennessee with complaints of progressive generalized

6

weakness. (Tr. 806.) Ms. Gilliam described that she had developed a series of medical illnesses over the previous decade. (Tr. 797.) She said that she had lost her appetite and could not keep food down, leading to cachexia severe enough that she could no longer ambulate. (*Id.*) She presented at five feet, seven inches tall, and she weighed 103 pounds. (*See* Tr. 798.)

The hospital physician noted that Ms. Gilliam's medical history listed "a myriad of psychosomatic issues including fibromyalgia, migraine, narcolepsy, [and] decreased appetite." (*Id.*) Ms. Gilliam and her family also reported a family history of thyroid conditions. (*Id.*) The hospital physician requested a consultation with an endocrinologist and opined that Ms. Gilliam needed further "subspecialist medical workup" that the medical center may not be equipped to complete. (*Id.*)

In January 2016, R. William Taylor, D.O.—a board certified specialist in neuromusculoskeletal medicine in Florida—wrote a letter in support of a disability application for Ms. Gilliam. (Tr. 263.) Dr. Taylor identified that Ms. Gilliam had been diagnosed, by other providers, with refractory migraine, central sensitization syndrome with fibromyalgia features, autoimmune connective tissue disease, hypotension with tachycardia, hypothyroidism, proximal colon transit delay, multiple vitamin deficiencies, transient limb paralysis, and ataxia. (*Id.*) Dr. Taylor opined that recent diagnoses of colonic transit delay and vitamin deficiencies may explain the transient limb paralysis, "lack of coordination," and ataxia. (*Id.*)

Ms. Gilliam returned to Johnson City Medical Center in August 2016, complaining of falls and increased sleepiness. (Tr. 587.) An endocrinologist noted a recent diagnosis of secondary adrenal insufficiency and opined that there was no evidence of a current adrenal crisis. (*Id.*) The endocrinologist wrote that the sleepiness and fall were likely due to medication noncompliance.

(*Id.*) Ms. Gilliam was started on 15 mg of hydrocortisone maintenance in the morning and 5 mg in the evening. (*Id.*)

Ms. Gilliam continued receiving Botox injections to treat her chronic migraine; at a follow-up appointment with Dr. Shawn Nelson in August 2017, Ms. Gilliam complained that she was having more difficulty with her narcolepsy symptoms. (Tr. 1172.) She said she was "sleepy all the time" and said she had experienced falls. (*Id.*) She said she believed she had a history of cataplexy. (*Id.*) On examination, Ms. Gilliam weighed 122 pounds and displayed full strength, a normal muscle tone, and normal gait. (Tr. 1174.) Dr. Nelson started Ms. Gilliam on venlafaxine, which Dr. Nelson believed would help her narcolepsy while also providing benefits with respect to her migraines and other neurological symptoms. (Tr. 1175.)

Records reflect that Ms. Gilliam had been prescribed hydrocortisone for adrenal insufficiency starting in at least 2017. (*See* Tr. 931.)

In May 2019, Ms. Gilliam presented to a hospital complaining of increased joint swelling, joint pain, and "uncontrollable muscle movements." (Tr. 543.) She was observed to have difficulty controlling her arms and legs. (Tr. 540.) During her hospital stay, a psychiatric consultation found her to be hyperverbal and emotionally labile. (Tr. 485.) Her husband and mother admitted that they had been obtaining narcotics to give to Ms. Gilliam to help her pain. (Tr. 485.) The psychiatrist diagnosed Ms. Gilliam with bipolar disorder; severe opioid use disorder; severe sedative, hypnotic, or anxiolytic use disorder; severe amphetamine-type substance use disorder; generalized anxiety disorder; and insomnia disorder. (Tr. 486.)

Ultimately, Ms. Gilliam's treating professionals filled out paperwork to have her involuntarily committed at another institution, but there was difficulty transporting her after she became extremely drowsy, to the point that she could not be awoken even to take medicine.

8

(Tr. 534.) Her mother and husband admitted that they had given her an injection of Emgality, but they said a doctor had told them it was safe to administer that medicine. (*Id.*)

Ms. Gilliam's family brought her back to a hospital in August 2019 because they had observed "abnormal limb movements" and because Ms. Gilliam had elevated heart rate and blood pressure. (Tr. 404.) The hospital physician noted that she had recently been hospitalized for weakness, and records reflected concern about whether Ms. Gilliam truly has Addison's disease in light of the fact that she was "likely . . . taking too large a dose of hydrocortisone." (*Id.*) It was noted that the clinicians had recommended an extended taper of that medication, and the hospital clinician noted that the taper may have initiated her current symptoms. (*Id.*) Ms. Gilliam was stabilized on hydrocortisone and discharged, but the physician recommended a psychiatric follow up because "[t]here may be a strong psychiatric component to all of this." (*Id.*) Hospital records reflect a discharge diagnosis of Addison's disease. (Tr. 403.)

Ms. Gilliam's family brought her back to the emergency department on October 15, 2019, with concerns that she had an altered mental status and had "not been well for some time." (Tr. 389.) On examination, Ms. Gilliam appeared anxious, confused, and lethargic. (*Id.*) She was inattentive and presented with "garbled" speech." (*Id.*) Ms. Gilliam was ambulatory, but she used a rollator or the assistance of family as needed. (*Id.*) Ms. Gilliam complained of an "aching, crushing" pain. (*Id.*)

Ms. Gilliam and her family presented a "very convoluted" story about her history of present illness. (*See* Tr. 283.) She said she had a Valium prescription and prescriptions for other pain medications, but no such prescriptions showed in the hospital's computer system. (*Id.*) The hospital physician expressed concern that Ms. Gilliam had been using drugs that had not been prescribed

to her, and he also expressed concern over "the high doses of steroids she has been on for over a year." (*Id.*) Ms. Gilliam was apparently taking 40mg of hydrocortisone twice daily. (*Id.*)

Ms. Gilliam had elevated white blood cells, likely from steroid use. (*Id.*) The physician noted that the high dose steroids could have caused many of her physical and mental symptoms, and he wrote that clinicians at another facility had also expressed concern about the steroids. (*Id.*)

Ms. Gilliam was admitted to the hospital for several days. She displayed "chorea-like movements" at times, was seen to exhibit severe difficulties controlling her lower extremities, and reported that she was weak and unable to walk. (Tr. 330, 377.)

She was assessed to have systemic inflammatory response, likely secondary to steroids, and acute encephalopathy, likely secondary to the steroids and also to the use of opioids, amphetamine, and benzodiazepines. (Tr. 290.) The recommendation was to taper the dosage of steroids in an inpatient setting while avoiding opioids and with an additional neurology consultation for narcolepsy. (*Id.*) Ms. Gilliam refused a recommended referral for a psychiatry consultation because she "does not trust anything that they do and either does the mother." (*Id.*)

Ms. Gilliam consulted with primary care physician Mubashir Mahmood, M.D., on November 15, 2019. (Tr. 918.) She weighed 145 pounds at the appointment. (*Id.*) She complained of excessive daytime sleepiness and trouble staying asleep at night, among other things. (Tr. 922.) Dr. Mahmood noted that she had been prescribed steroids for adrenal insufficiency, the dosage of which had been reduced in 2017. (*Id.*) She said she had previously had cataplexy and bouts of sleep paralysis, after experiencing multiple concussions with a history of post-concussion syndrome. (*Id.*) On examination, Ms. Gilliam was ambulating normally and appeared healthy and well-nourished. (Tr. 923.) She had good judgment, normal mood and affect, and she was active and alert. (*Id.*) Dr. Mahmood noted that Ms. Gilliam's chronic use of steroids had led to

hypothalamic-pituitary-adrenal axis suppression, but he said that he was unable to establish a diagnosis and do a restudy because Ms. Gilliam was "very emotionally unstable to stop or wean off steroids." (Tr. 924.) Dr. Mahmood wrote that Ms. Gilliam needed to see a neurologist, a rheumatologist, a cardiologist, and a psychiatrist. (*Id.*)

At a follow-up appointment on November 26, 2019, Ms. Gilliam presented with limited ambulation and appeared to be in mild distress. (Tr. 909.) She was lethargic, anxious, and agitated, with an abnormal affect. (*Id.*) Her remote memory was normal, but her recent memory was abnormal. (*Id.*) She had normal muscle tone but abnormal muscle strength. (Tr. 910.) She had limited range of motion. (*Id.*) Her deep tendon reflexes were abnormal, but she had a normal gait and station. (*Id.*) In addition to the recommended referrals from the last appointment, Dr. Mahmood recommended consultation with a pain specialist. (*Id.*)

On December 18, 2019, an MRI of Ms. Gilliam's left knee showed multiple bone infarcts at the femur with a large unstable osteochondral fragment at the posterior aspect of the lateral femoral condyle. (Tr. 1131.) The radiologist could not exclude a lateral meniscal tear. (*Id.*)

The next day, Ms. Gilliam established care with Michelle Bullock, a certified nurse practitioner, and James Schrenker, M.D. (Tr. 1121.) Ms. Gilliam said that she lived with others and was not able to care for herself. (Tr. 1123.) She denied muscle weakness, weight gain, or weight loss. (Tr. 1124.) She said that she was in a lot of pain, especially in her knees, and she said she had experienced many falls (most recently in 2013). (*Id.*; Tr. 1125.) She said she was under a lot of stress and had narcolepsy. (*Id.*) On examination, she appeared distressed and chronically ill; she was confused and anxious. (*Id.*) She exhibited poor insight, but she was oriented to time and place. (*Id.*) She had a "wide-based" gait, showed hypotonicity in her motor functions, and had a strength of four on a scale of five. (Tr. 1125.)

Ms. Gilliam returned to Dr. Schrenker on January 3, 2020. (Tr. 1114.) She appeared distressed, acutely ill, and chronically ill. (Tr. 1118.) She was lethargic and confused, with a flat affect. (*Id.*) Her examination was positive for joint tenderness and swelling. (*Id.*) She presented to the appointment in a wheelchair, with hypotonicity and strength of only one of five. (*Id.*) Dr. Schrenker noted that Ms. Gilliam fell out of her wheelchair at some point in this appointment. (*See* Tr. 1119.) Dr. Schrenker wrote that Ms. Gilliam was "very tangential, off point, over detailed and nearly stup[o]rous." (Tr. 1118.)

Ms. Gilliam followed up with Dr. Schrenker on January 20, 2020; the doctor noted that she was not in a wheelchair but she "walks like the scarecrow in wizard of OZ and requires mod assist of one to get up on the table." (Tr. 1112.)

On February 7, 2020, an MRI of the cervical spine showed degenerative disc disease, most prominent at C3–C4 levels with moderate central stenosis and bilateral neural foraminal narrowing. (Tr.1127–28.)

Ms. Gilliam met with Dr. Schrenker again on February 20, 2020. (Tr. 1094.) Ms. Gilliam was again "not fully alert" and "ill-appearing." (Tr. 1095.) Her gait was unchanged from previous appointments. (Tr. 1099.) Dr. Schrenker wrote that Ms. Gilliam "needs a wheelchair most of [the] time." (*Id.*) He expressed strong concerns about polypharmacy (*Id.*) He recommended centralized medication management with the Mayo Clinic. (*See id.*)

Appointment notes after Ms. Gilliam's date last insured reflect that she has used a wheelchair and other assistive devices. (*See, e.g.*, Tr. 3904–05.) But providers noted poor home compliance and limited follow up. (Tr. 3904.) At an appointment on August 12, 2020, Ms. Gilliam displayed lateral sway and unsteadiness when walking for 10 feet. (Tr. 3906.)

In June 2020, Ms. Gilliam consulted with Vahid Entezari, M.D., in a virtual appointment. (Tr. 3980.) Dr. Entezari noted that Ms. Gilliam was "very frail and weak" and could "barely speak with truncated sentences." (Tr. 3980–82.) Dr. Entezari also noted that x-rays showed "a large poor option of humeral head has gone on to avascular necrosis in both shoulders with collapse with loss of roundness of the humeral head." (Tr. 3982.) Dr. Entezari had been consulted because Ms. Gilliam was at an inpatient facility and had reported a significant decline, including that she was unable to dress or bathe herself. (*See* Tr. 3984–85.) She could not walk on her own and experienced frequent falls. (Tr. 3985.)

At a physical therapy appointment on June 30, 2020, the physical therapist noted that Ms. Gilliam was unsteady and uncoordinated even upon walking for four feet. (Tr. 3975.)

A gynecologist in August 2020 noted that Ms. Gilliam needed assistance to complete her activities of daily living. (Tr. 3893.)

In May 2022, a doctor observed Ms. Gilliam as a "a frail appearing female in a motorized wheelchair which she uses essentially all of the time, because of her weakness." (Tr. 1800.)

In June 2023, Xian Wen Jin, M.D., Ph.D., provided a letter stating the opinion that Ms. Gilliam's "multiple chronic medical problems" have rendered her disabled since 2020. (Tr. 6855.) Dr. Jin had been treating Ms. Gilliam since July 2020. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ found that Ms. Gilliam met the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 22.) The ALJ next found that Ms. Gilliam had not engaged in substantial gainful activity between the date of the alleged onset of disability (January 1, 2015) and her date last insured. (*Id.*)

The ALJ next determined that Ms. Gilliam had the following severe impairments: (1) unspecified arthropathies; (2) migraines; and (3) other disorders of the gastrointestinal system.

13

(*Id.*)

The ALJ further found that Ms. Gilliam had several non-severe impairments: (1) personality disorders; (2) depressive disorders; and (3) drug addiction disorder. (*Id.*)

The ALJ determined that none of Ms. Gilliam's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 23.)

The ALJ determined that Ms. Gilliam had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 24.) Specifically, Ms. Gilliam could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (*Id.*) She must never climb ladders, ropes, or scaffolds. (*Id.*) She must avoid all exposure to hazards like unprotected heights and moving machinery. (*Id.*) She cannot drive commercially. (*Id.*)

The ALJ found that Ms. Gilliam was 36 years old on the date last insured and had at least a high school education. (Tr. 28.)

The ALJ then determined that—considering Ms. Gilliam's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as an "information clerk" (DOT 237.367-018), "cashier" (DOT 211.462-010), or "merchandise marker" (DOT 209.587-034). (*Id.*) Accordingly, the ALJ determined that Ms. Gilliam is not disabled. (Tr. 29.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986)

14

(*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

15

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.      Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at \*17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at \*17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.      Analysis

In her assignment of error, Ms. Gilliam argues that the ALJ did not consider all the evidence relevant to her condition prior to the date last insured. She contends that the ALJ flatly refused to consider evidence postdating the DLI, even evidence that was reasonably proximate in time to the DLI and which was relevant to a consideration of her condition in the relevant period. And she argues that the ALJ failed to understand the link between her long history of prescribed high-dose steroids and her subsequent development of avascular necrosis.

Ms. Gilliam argues that the ALJ erred at Step Two when he failed to find (or discuss) her Addison's disease or secondary adrenal insufficiency, or her complicated narcolepsy with

17

cataplexy and insomnia, and when the ALJ found Ms. Gilliam's anxiety to be a non-severe impairment. (Pl.'s Br. at 10–13, ECF No. 9, PageID# 6900–02.)

At Step Two, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). But when an ALJ finds severe and non-severe impairments at Step Two and continues through the subsequent steps in the sequential evaluation—as was the case here—any error at Step Two is normally harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Floyd v. Comm'r of Soc. Sec.*, No. 23-2036, 2024 WL 3103757, at *2 (6th Cir. June 24, 2024).

The Commissioner argues that any error at Step Two is harmless here. The Commissioner asserts that, while the ALJ did not find Ms. Gilliam's adrenal insufficiency to be a severe condition, the ALJ nevertheless considered evidence relevant to the condition when crafting the RFC. (Comm'r's Br. at 6–7, 9–10, ECF No. 12, PageID# 6913–14, 6916–17.) The Commissioner further contends that the ALJ accurately summarized the treatment record and was not required to discuss every piece of evidence in this extensive file. (*Id.* at PageID# 6912, 6914.) And finally, the Commissioner argues that the ALJ's failure to discuss the post-DLI evidence regarding avascular necrosis was reasonable because the state agency medical doctor reviewed that evidence and

18

apparently concluded that the evidence did not relate back to the relevant period. (*Id.* at PageID# 6914–15 (citing Tr. 78).)

In her reply brief, Ms. Gilliam argues that the harmless-error analysis does not apply to the ALJ's failure at Step Two to identify several conditions, including her adrenal insufficiency or avascular necrosis, as medically determinable impairments in the first place. (Reply Br. at 3, ECF No. 13, PageID# 6923.)

While Ms. Gilliam does not cite caselaw in support of her position, I am aware that courts within and outside of this circuit have distinguished between an ALJ's finding that a medically determinable impairment is non-severe and a finding that an alleged condition is not a medically determinable impairment in the first place. Generally, courts have found that an ALJ's failure to find that a condition is medically determinable is not harmless error unless the record reflects that the ALJ nevertheless considered the impairment in developing the RFC. *See Durbin v. Comm'r of Soc. Sec.*, No. 2:17-cv-896, 2020 WL 2744100, at *13–14 (S.D. Ohio May 27, 2020); *Kelley v. Comm'r of Soc. Sec.*, No. 1:24-cv-506, 2025 WL 1903777, at *3 n.1 (W.D. Mich. July 10, 2025) (collecting cases); *see also Bruce v. Comm'r of Soc. Sec.*, 2022 WL 1555402, at *6 (N.D. Ohio May 17, 2022).

Here, the ALJ found severe impairments of "unspecified arthropathies, migraines, and other disorders of the gastrointestinal system," and he found non-severe medically determinable impairments of personality disorders, depressive disorders, and drug addiction disorder. (Tr. 22.) In the cursory Step Two discussion, the ALJ does not even mention adrenal insufficiency, avascular necrosis, or anxiety. (*See id.*)

The ALJ seems to have discounted adrenal insufficiency, avascular necrosis, and anxiety as medically determinable impairments, despite the fact that the ALJ later specifically

acknowledged that Ms. Gilliam had been on steroids since 2016 "for a provisional diagnosis of Addison's disease," which dose was tapered multiple times. (Tr. 26.) And the ALJ also acknowledged that Ms. Gilliam had presented to the hospital in 2015 and 2019 with complaints of progressive weakness and "significant decline," with symptoms largely attributed to Ms. Gilliam's taking high-dose steroids. (Tr. 25–26.)

After careful consideration, I conclude that the ALJ committed reversible error at Step Two and in developing the RFC.

First, it is not at all clear from the decision whether the ALJ actually considered whether adrenal insufficiency and avascular necrosis were medically determinable impairments in the first place. While it is possible that the ALJ did consider these conditions—an inference that would be somewhat supported by the ALJ's later consideration of the evidence related to high-dose steroids—the ALJ's failure to adequately state or explain that consideration impairs the Court's ability to review that condition. *See Borger v. Comm'r of Soc. Sec.*, No. 3:20-CV-01930-JGC, 2021 WL 6297536, at *13 (N.D. Ohio Dec. 17, 2021) ("[I]t may be possible to infer that the ALJ considered [the plaintiff's] DVT diagnosis to be medically determinable but not severe . . . . If the ALJ considered DVT not a medically determinable impairment, then failing to include it in the RFC is not error. Contrariwise, if the ALJ considered DVT a medically determinable impairment, then failing to include it in the RFC is error, whether severe or non-severe. Without clear direction in the ALJ's decision, this Court cannot properly review the ALJ's decision . . . ."), *report and recommendation adopted*, 2022 WL 60212 (Jan. 6, 2022). Moreover, the ALJ stated at the hearing that "2020, 2021, all that is not stuff that I look at." (Tr. 51.) That statement suggests that the ALJ did not consider whether avascular necrosis, at least, was a medically determinable impairment in the first instance.

It would be unreasonable to expect an ALJ to identify every condition in a 6,000 page record that the ALJ considered and rejected as a medically determinable impairment. But here, considering the evidence of adrenal insufficiency and avascular necrosis (discussed further below) during the relevant period, the ALJ's near total silence on these conditions casts significant doubt upon whether and how the ALJ considered them at Step Two. For example, did the ALJ find them to be not medically determinable? Or did the ALJ find that even if they were medically determinable, the evidence established that Ms. Gilliam could nonetheless perform light work? In other words, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Second, the ALJ erred when crafting the RFC. The ALJ's discussion of the effect of Ms. Gilliam's adrenal insufficiency and the effect of her high-dose steroids was as follows, in relevant part:

> She reported weight loss, lack of energy, and fatigue. She saw several doctors, but medication did not help, and she felt her body was shutting down. The claimant testified that she left [her last employer] due to chronic migraines, and received short term disability. She has used a wheelchair since June 2020, and before then, uses a cane and walker. She has problems lifting. The claimant reported migraines daily. She was also treated with steroids, but they made things worse.
>
> . . .
>
> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> . . .
>
> She was placed on steroids in 2016 for a provisional diagnosis of Addison's disease, that was tapered multiple times. At admission [in October 2019], the claimant was taking 40mg of hydrocortisone daily. . . . Many of the claimant's symptoms were attributed to high dose steroids. The claimant was diagnosed with systemic inflammatory response likely secondary to

21

steroids, acute encephalopathy likely due to large doses of steroids, opioids, benzodiazepines, and amphetamine usage, and hypokalemia due to steroid use.

. . .

In sum, the degree of limitation alleged is not fully supported by the objective evidence prior to the date last insured. Most of the claimant's symptoms were attributed to pharmacology, particularly steroid use. Despite her symptoms, records generally show intact gait, full range of motion, and intact cognition, concentration, and attention

(Tr. 24–27) (internal record citations omitted).

The ALJ did not cite any medical records after December 2019, with the exception of Dr. Xian Wen Jen's 2023 opinion letter. (Tr. 6855.) The ALJ repeatedly wrote that Ms. Gilliam presented with an intact gait and full range of motion (*see* Tr. 26, citing Tr. 1191 (Feb 2019 appointment), Tr. 1240 (Nov 2019 appointment)).

The Commissioner defends this discussion, arguing that it reflects that the ALJ ultimately considered both the provisional Addison's disease diagnosis and Ms. Gilliam's narcolepsy when crafting the RFC. The Commissioner argues that the ALJ accurately summarized the treatment record, and the Commissioner points out that Dr. Siddiqui had considered some post-DLI evidence in coming to his conclusions in the case. Finally, the Commissioner disagrees that the ALJ should have considered more post-DLI evidence, arguing that such evidence is minimally probative.

I disagree that the ALJ accurately and completely summarized the treatment record. The ALJ relied heavily on two findings that Ms. Gilliam had a normal gait and full range of motion in 2019. (*See* Tr. 26, citing Tr. 1191 (Feb 2019 appointment), Tr. 1240 (Nov 2019 appointment)). But these appointments focused primarily on Ms. Gilliam's migraines. The ALJ ignores contemporaneous notes from other appointments showing that Ms. Gilliam was frail and presented with limited ambulation, limited range of motion, and a wide gait. (*See* Tr. 909, 1125.)

22

More concerning, the ALJ does not mention the examination findings from January and February 2020 (one fewer than five days after the DLI) that were significantly probative as to Ms. Gilliam's gait, strength, and ability to ambulate during the disability period. The ALJ does not wrestle, for instance, with Dr. Schrenker's observation on January 3, 2020, that Ms. Gilliam presented with hypotonicity and strength of one out of five, "walk[ing] like the scarecrow in wizard of OZ" and requiring assistance to get onto a table. (Tr. 1112, 1118.) Nor does the ALJ explain his consideration of Dr. Schrenker's note from February 20, 2020, that Ms. Gilliam's gait was unchanged and that she "needs a wheelchair most of [the] time." (Tr. 1099).

The lack of an acknowledgement of this evidence—or any evidence postdating the DLI—leads to ambiguity as to whether the ALJ considered this evidence in formulating the RFC. Again, in this case and on this record, the ambiguity is such that the decision fails to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. In light of the ALJ's statement at the hearing that he would not "look at" records from 2020 and 2021, it seems likely that the ALJ did not consider these records at all. That also amounts to error here.

"[M]edical evidence that postdates the insured status may be, and ought to be, considered insofar as it bears on the claimant's condition prior to the expiration of insured status." *Carter v. Comm'r of Soc. Sec.*, No. 5:12CV2321, 2013 WL 3940874 at *6 (N.D. Ohio July 30, 2013) (internal quotation marks omitted); *see also Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time.")

Here, the ALJ was presented with a DLI of December 31, 2019. (Tr. 22.) A treatment record from three days later shows significant abnormal gait and an assessment of severe adrenal insufficiency and muscle weakness (Tr. 1118–19.) Two months after her DLI, the doctor assessed

that Ms. Gilliam had idiopathic aseptic osteonecrosis, which Dr. Schrenker sought to investigate through an orthopedic consultation. (*See* Tr. 1112.) Less than six months after her DLI, Ms. Gilliam was diagnosed with avascular necrosis in the shoulders. (Tr. 3982.) She was "very frail and weak." (Tr. 3980–82.) The progression continued, such that by 2022 a doctor observed Ms. Gilliam as a "a frail appearing female in a motorized wheelchair which she uses essentially all of the time, because of her weakness." (Tr. 1800.)

The Commissioner's argument that these records, especially those from 2020, are minimally relevant is not well-taken. Reviewing the record as a whole, there is more than enough evidence to raise the question as to whether Ms. Gilliam—during the relevant disability period—was under a chronic progression to avascular necrosis, weakness, and frailty as a result of adrenal insufficiency and the course of treatment for that insufficiency.

Doctors both before and after Ms. Gillian's DLI expressed concerns that Ms. Gilliam's adrenal insufficiency and related regimen of high-dose steroids were contributing to her weakness and other symptoms. *See, e.g.*, Tr. 931 (hydrocortisone prescriptions since at least 2017); Tr. 404 (August 2019: "taking too large a dose of hydrocortisone" and noting that an extended taper likely caused her acute symptoms); Tr. 283 (October 2019: expressing concern over the high dose of steroids); Tr. 923–24 (November 2019: steroid use had led to hypothalamic and pituitary suppression, but the doctor made no change to the regimen because Ms. Gilliam was opposed to weaning); Tr. 1094 (February 2020: expressing strong concerns about polypharmacy—"she is on way too may drugs and has way to[o] many doctors"); Tr. 3980 (June 2020: stating that steroid use had led to avascular necrosis and even tapering had not improved her overall condition).

This is exactly the kind of progressive condition that calls for a holistic and longitudinal review of the record evidence, including relevant evidence that postdates but is reasonably

24

proximate to the DLI. *See Carter*, 2013 WL 3940874, at *9 ("Given the progressive nature of [the plaintiff's] condition [liver disease], . . . post-DLI evidence which is both relevant and reasonably proximate in time to a pre-DLI condition may be considered . . . .")

Because the ALJ failed to consider the relevant and reasonably proximate medical records relevant to Ms. Gilliam's strength, gait, adrenal function, and potential avascular necrosis during the period of alleged disability, reversal and remand is warranted. Of course, the date of the evidence compared to the DLI is a permissible factor to be considered in assigning a *relative weight* to that evidence. *E.g.*, *Sweitzer v. Astrue*, No. 1:08–CV–170, 2009 WL 3064665, at *3 (E.D. Tenn. Sept. 23, 2009); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (finding that evidence dated after a claimant's date of last insured may be considered but a delay of two years renders that evidence "minimally probative"). But the ALJ erred by failing to consider this evidence at all.

I am also not persuaded that the ALJ's failure to cite relevant and reasonably proximate post-DLI evidence can be excused because Dr. Siddiqui reviewed that evidence during the agency's internal administrative review. The Commissioner directs the Court to no caselaw supporting that position. And the ALJ here found Dr. Siddiqui's opinion to be unpersuasive anyway. (Tr. 26–27.)

I would expect a reasoned consideration of this matter on remand would include a discussion of the relevant and reasonably proximate medical evidence, including a discussion of the relevant weight assigned to this evidence as the evidence grows more remote from the DLI.

Finally, I find troubling the ALJ's statement that "[m]ost of the claimant's symptoms were attributed to pharmacology, particularly steroid use." (Tr. 26.) While it is true that medical records reflect significant professional concern over polypharmacy, the ALJ does not explain his consideration of this fact. Ms. Gilliam reads the decision as a critique of her as a patient, especially

in light of the ALJ's citations to places in the record showing medication noncompliance and doctors' concerns about other drug use. That is not an unreasonable reading of the decision. I also note that it seems that Ms. Gilliam has not complied with treatment recommendations related to steroid use over the years, including recommendations to wean the dosage in an inpatient setting, to obtain psychiatric help, and to wean the dosage to reassess her diagnosis.

But the ALJ does not significantly grapple with the fact that Ms. Gilliam's high dose of hydrocortisone was prescribed to her and continued by her doctors for years. I would expect a reasoned consideration of this matter on remand would include further consideration and explanation of the effect of polypharmacy on Ms. Gilliam's condition during the alleged disability period. And if the ALJ finds that noncompliance or illegal drug use is a factor relevant to the disability decision, I would expect a fuller explanation of that conclusion.

In this matter, it is not clear whether the ALJ considered the extent to which adrenal insufficiency and avascular necrosis are medically determinable impairments, despite significant probative evidence raising that question. It is equally unclear whether the ALJ considered these conditions when crafting the RFC. In crafting the RFC, the ALJ credited two findings of a normal gait within the disability period while ignoring several contemporaneous findings of abnormal gait and strength (again without significant explanation). More concerning, the ALJ seems to have entirely disregarded all medical record evidence postdating the DLI, even evidence that is relevant and reasonably proximate to the DLI such that it may be probative as to Ms. Gilliam's condition during the alleged disability period. Finally, it is clear that the ALJ found polypharmacy to be a significant factor in crafting the RFC, but it is unclear from the decision how the ALJ considered the effect of polypharmacy.

Under these circumstances, reading the decision as a whole, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011). Thus, the ALJ's decision should be reversed and this matter remanded.

Because I am recommending a reversal based on the ALJ's discussion of Ms. Gilliam's adrenal insufficiency and related conditions, and because I recommend a remand for further consideration and a new decision, I do not further address Ms. Gilliam's arguments as to narcolepsy or anxiety.

Before concluding, I note that I am not convinced by Ms. Gilliam's argument that the Court should award benefits immediately. (*See* Pl.'s Br. at 13, ECF No. 9, PageID# 6902.) While Ms. Gilliam is correct that the medical record related to the alleged period of disability is unlikely to change on remand, this case raises complex and unresolved factual issues that I believe an ALJ is in the best position to resolve in the first instance.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this matter for further proceedings consistent with this Report and Recommendation.


Dated:  April 7, 2026                                           /s/ *Jennifer Dowdell Armstrong*
                                                               Jennifer Dowdell Armstrong
                                                               U.S. Magistrate Judge


## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within**

27

**fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the

28

interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).